Frederick G-. Schmidt, Off. Bef.
This proceeding under article 78 of the Civil Practice Act was referred to me to hear and determine. On the hearing a stipulation was offered in evidence, stipulating that no witnesses would be called, but that the case should be decided on the following documents: (1) minutes of a meeting of the Zoning Board of Appeals of the Village of Ardsley held January 29, 1958, or a copy thereof which need not be certified, without exhibits; (2) minutes of a meeting of the Zoning Board of Appeals of the Village of Ardsley held March 15, 1958, or a copy thereof which need not be certified; (3) subdivision map of Ardsley Bidge dated May 25, 1953, or a copy thereof which need not be certified; (4) survey of property prepared for Justin Lubold dated February 11, 1956, or a copy thereof which need not be certified; (5) copy of bargain and sale deed dated May 23, 1955 from Ardsley Bidge, Inc., to Boy S. Johnson, which copy need not be certified; (6) copy of agreement, dated December 7, 1955, between Ardsley Bidge, Inc., and Eloy S. Johnson, releasing or modifying, or purporting to release or modify a restrictive covenant contained in the deed above mentioned; (7) copy of the Zoning Ordinance of the Village of Ardsley, as amended through January 29, 1958, which need not be certified.
From these, the following facts appear:
1. Subdivision map of Ardsley Bidge, called Map No. 9505, was duly approved by the Planning Board of the Village of Ardsley on December 9, 1954 and filed in the County Clerk’s office on December 13, 1954.
2. This map, as originally presented, included lot 8A, which was 50 feet by 150 feet, and therefore contained the required 7,500-square-foot area, but had a frontage of 50 feet rather than 75 feet because it abutted upon the end of Hilltop Boad, a public street, which was 50 feet wide.
3. As a condition of the approval of this map, the Planning Board required the developer to give the area adjacent to Hilltop Boad to a depth of 50 feet for an extension of Hilltop *9 Boad, so that a 50-foot frontage might be given to two lots, which would otherwise be landlocked. This area, 50 feet by 50 feet, was designated on said map “Village of Ardsley This reduced lot 8A to 100 feet in depth with a frontage on Hilltop Boad as extended of slightly more than 50 feet and an area of slightly more than 5,000 square feet.
4. On May 23, 1955 the developer conveyed to the petitioner lots 8 and 8A, as shown on said map. The deed recited, in the form used in deeds to lots in this development, that one house could be built on the premises conveyed.
5. On December 7, 1955 an agreement was entered into between the grantor and the grantee that the above deed should be modified to permit the erection of a house on each lot.
6. Lot 8 contains about 2% acres.
7. On May 18, 1956 the petitioner conveyed lot 8 to Joyce Lubold.
8. On said map, lot 8A is separated from lot 8 by a dotted line, and the minutes of the meeting of the Zoning Board of Appeals show that the Planning Board had considered that lots 8 and 8A constituted one lot and gave two numbers to the parcel to facilitate the sale of parcel 8A to an owner of adjoining property as a right of way or otherwise, and that it was the usual custom of the Planning Board to use solid rather than dotted lines to designate the boundaries of lots on maps that it approved. The petitioner denied that the two numbers were given for the reason above stated.
9. The minutes of a hearing before the Zoning Board of Appeals show that no owners of other property in the neighborhood offered any objection to the variance requested.
10. While petitioner owned both lots 8 and 8A, he could have increased the area of lot 8A to 7,500 square feet by taking land from lot 8, which land was hilly and rocky and not usable for building or road purposes.
11. The Village Board directed the Building Inspector to issue a building permit to the owner of a lot, which would have been without a frontage on a street, except for the presence of the extension of Hilltop Boad, the parcel designated ‘ ‘ Village of Ardsley ” on the map.
Upon the refusal by the Board of Appeals to grant a variance to permit the erection of a four-room house on lot 8A, this proceeding was instituted.
The principal factor to be considered is the effect of the approval of the subdivision map with a substandard lot, 8A, by the Planning Board.
*10 I do not believe that there is any significance in the ■ dotted line. There is no requirement of law that lot lines be solid, and the fact is that this map was approved with a dotted line dividing lot 8A from lot 8, even if it be true that the custom of this Planning Board was to use solid lines. Nor do I think it significant, as testified by the former chairman of the Planning Board, that its motive in approving the map with the substandard lot, was to facilitate the use of this lot as a right of way or otherwise. The map speaks for itself. Lot 8A originally contained the required area. This area was decreased by the Planning Board to give street frontage to two lots, not owned by the developer, which would otherwise not be eligible for building permits. By requiring the developer to offer the front 50 feet of this'lot to the village, the area of lot 8A became substandard. It retained a 50-foot frontage on Hilltop Road as extended, and each of the previously landlocked lots obtained a 50-foot frontage, which gave all three lots frontages which were substandard.
I call attention to the fact that the Village Board itself directed the Building Inspector to issue a building permit for one of these lots with only a 50-foot frontage on Hilltop Road as extended. In my opinion, this act by the Village Board constituted an acceptance of the 50-foot extension of Hilltop Road, which the Planning Board had required the developer to offer to the village by including in its map the 50-foot by 50-foot area marked “ Village of Ardsley ”. Thus, there was an offer of dedication and an acceptance of this extension of Hilltop Road by the action of the Village Board.
The Planning Board,, having created the substandard area of lot 8A, and having approved the map which showed clearly the substandard factor existing in the lot, the petitioner was entitled to rely on this action. The board, which required the removal of the front 50 feet of this lot for the purpose stated, could have required 50 feet to be added to the rear of this lot, taking such area from the 2% acre lot 8. But it did not do this. The board, in approving the map with the substandard area which it had created, knew that such a substandard lot might be used for building purposes with the permission of the Board of Appeals, which it might reasonably have expected would be granted, especially since the shortage in area was created by the dedication of a portion of the lot to the village for its benefit. It was for its benefit, because by the dedication, two other lots, owned by others, became legally usable for buildings with the resulting tax benefit to the village.
*11 Since the village had accepted the dedication of this 50-foot by 50-foot parcel for street purposes, the deed dated' September 12,1957 from Ardsley Ridge, Inc., of this parcel to the petitioner is a nullity.
We do not have here a hardship created by the petitioner. He has made no change in the substandard lot. Only the Planning Board created the substandard area, when it approved the map including the substandard lot. On this approval the owner of the lot could rely. He was not obligated to increase the area of this lot, and neither he nor anyone else could give him 75-foot frontage, since the street on which it abutted was only 50 feet wide.
The action of the Zoning Board of Appeals denying petitioner’s application for a variance means that there is complete sterilization of this lot. The owner cannot use it. He has loft to him only the right to pay taxes on it.
The case of Matter of Long Is. Land Research Bur. v. Young (7 Misc 2d 469) is an authority in point. At page 471, the court said: ‘ ‘ When a municipal legislative body divides a town or village into districts and prescribes the minimum land dimensions for particular uses in such districts, it does so with at least constructive notice of the existence therein of every substandard parcel held in single, separate ownership. It is under an absolute duty to make adequate provisions for such parcels. While it can limit their use, it cannot render them useless. True, a line always exists beyond which the erection of a dwelling, or place of business, or any other use of a substandard lot may have become detrimental to the general welfare, but in such cases the municipality is bound to compensate the owner if it proposes, in the public interest, to bar his property from any practical use for which it might be suited. It cannot compel him to sell to an adjoining owner nor can it require him to purchase additional contiguous property, if such is available. Rather, it must itself acquire the property by purchase or condemnation since, in effect, it is taking it for a public purpose. Power to do so is found in subdivision 2 of section 64 of the Town Law, and in subdivision 35-a of section 89 of the Village Law.
Any complete sterilization of private property by legislative fiat without compensation to the owner is confiscatory and violative of article I (§ 7, subd. [a]) of the New York State Constitution and the Fifth Amendment of the United States Constitution. (See, also, Matter of Peters & Whalen v. Schnetser, 194 N. Y. S. 2d 333.)
*12 I therefore find the refusal of the Zoning Board of Appeals to grant a variance was. .arbitrary and unreasonable. The petitioner is entitled to an order setting aside said determination and to have a variance granted him.